1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   VICTORI A SHAEV,

4                   Plaintiff,

5          v.                                24 Civ. 5859 (AS)
                                             Order to Show Cause
6   NETSCOUT SYSTEMS, INC., ET AL,

7

8                   Defendants.

    ------------------------------x
9                                            New York, N.Y.
                                             August 19, 2024
10                                           1:00 p.m.

11  Before:

12                      HON. ARUN SUBRAMANIAN,

13                                           District Judge

14                           APPEARANCES

15  BARRACK RODOS & BACINE
         Attorneys for Plaintiff
16  BY:  A. ARNOLD GERSHON
         MICHAEL TOOMEY
17
    JENNER & BLOCK
18       Attorney for Defendants
    BY:  STEPHEN ASCHER
19

20

21

22

23

24

25

```
1              (In open court; case called)
2         DEPUTY CLERK:  Can the parties starting with counsel
3    for the plaintiff please state their appearances for the
4    record.
5         MR. GERSHON:  May it please the Court, my name is
6    Arnold Gershon.  With me is Mike Toomey, Michael Toomey.  We
7    are partners at Barrack Rodos & Bacine, and we represent the
8    plaintiff Victoria Shaev in this case.
9         THE COURT:  Good afternoon.
10        MR. ASCHER:  Good afternoon, your Honor.
11        THE COURT:  Do we have any one here for Netscout.
12        MR. ASCHER:  Yes, your Honor.  My name is Stephen
13   Ascher from Jenner & Block, and we represent Netscout and the
14   directors.
15        THE COURT:  Good afternoon, and welcome.  I don't --
16   you may not have had a chance to put in your appearances yet.
17   I assume you're going to do that shortly.  It may have come in
18   today.
19        MR. GERSHON:  We signed the sign in sheet, your Honor.
20   Is that sufficient?
21        THE COURT:  No.  It's all sufficient.  I'm just saying
22   for purposes of the docket, Mr. Ascher, have you already
23   entered the proceedings formally?
24        MR. ASCHER:  Not yet, no, your Honor.
25        THE COURT:  But you plan to do so?
```

1                MR. ASCHER:  Yes.

2                THE COURT:  And if I am reminded, I did in fact adopt

3     the proposed briefing schedule on the request for emergency

4     relief.  Mr. Ascher you got that schedule, I will obviously

5     hear you if there needs to be adjustments to that schedule.

6                MR. ASCHER:  I did see the order, yes, your Honor.

7     Thank you.

8                MR. GERSHON:  Your Honor, may I be heard on one point?

9     In our letter requesting a briefing schedule, we included a

10    typo.  We said July 28 instead of August 28.  I don't know

11    whether anybody noticed it or not.  We didn't until too late to

12    fix it.

13               THE COURT:  Since I adopted the proposed schedule, I

14    didn't notice it either, which is fine.  We will put it in

15    order with the correct dates just so everything is squared

16    away, unless, Mr. Ascher, you have any responses or need any

17    modification, which are fine with me.

18               Just as a technical matter -- let's first --

19    Mr. Ascher, I'm putting you in an unfair spot because you just

20    entered this case and you just received these papers.  But

21    anything you'd would want to communicate to the Court before --

22    I have some questions that I would love the parties to chime in

23    on, but I'll hear you first.

24               MR. ASCHER:  Thank you, your Honor.  And not unfair.

25    I hope to be prepared.

1      I think the main thing that your Honor should know is

2  that although we think that there was no obligation to do so,

3  Netscout has already filed a proxy supplement disclosing

4  precisely the information requested in the complaint.

5      THE COURT:  The assumptions underlying the Monte Carlo

6  simulation.

7      MR. ASCHER:  Correct, that's exactly what we filed in

8  a proxy supplement last Thursday.  So it is our position that

9  the case itself is moot, and the only outstanding issue is that

10  the plaintiffs are demanding a mootness fee for bringing this

11  to Netscout's attention.  Netscout believes that the

12  disclosures sought by the plaintiff were immaterial.  It's a

13  very technical reading of the statute, and we've agreed to --

14  no doubt we've agreed to make a disclosure in order to moot the

15  issue, but --

16      THE COURT:  You mean it's a technical reading of the

17  instruction underlying the regulation implemented in accordance

18  with the statute?  There's nothing in the statute that requires

19  any of this, right?

20      MR. ASCHER:  Correct.  This isn't an SEC reg. S-K item

21  402(d).

22      THE COURT:  Do you believe that there would be an

23  actionable claim based on the non-inclusion of the underlying

24  assumptions based on the language of the regulation and

25  everything else?

```
 1              MR. ASCHER:  We don't believe it was material, so we

 2    recognize that that there was an issue as to whether the

 3    information should have been disclosed, and so we are not -- we

 4    are not contesting the issue as to whether under the rule it

 5    should have been disclosed.  What we do have a significant

 6    question about is materiality.  We decided to moot that also by

 7    making the disclosure.  And so now really, your Honor, the only

 8    issue is whether there's any authority for them to receive some

 9    sort of fee for bringing like this to our attention.

10              I can explain, your Honor, if it would be helpful why

11    the disclosed information is so immaterial if you're interested

12    in hearing about that today.  That's starting to get more into

13    the weeds, but I'm prepared to do that.

14              THE COURT:  No, I'm happy for that to be briefed.  I

15    do have a separate question, which is, do the normal

16    requirements that would apply concerning loss causation apply

17    in this context despite the fact that the principal relief

18    sought is in the form of injunctive relief?  And then I'll hear

19    everyone on this.  But, obviously, there's the *Rubenstein* case

20    in the Second Circuit which relates to some of these issues.

21    There are also authorities in this district and also in

22    California that make clear that there is pleading requirement

23    of loss causation even in the context of a request for

24    injunctive relief.  And, Mr. Ascher, you can say I have no

25    view, I need to phone a friend, or whatever want to say, but if
```

1   you have any views on any of those issues, I'm just curious

2   because I did look through the papers and with the able

3   assistance of my law clerk did some research over the weekend,

4   and so I was just curious about those issues.

5           MR. ASCHER:  I understand, your Honor.  So we have not

6   focused on the issue of loss causation, the reason being that

7   we decide to the moot the issues --

8           THE COURT:  Yes, you just said you were going to

9   moot--

10          MR. ASCER:  -- and make disclosure.  So from our

11  perspective, the primary issue, which, frankly, I think might

12  be undisputed, but maybe I'll hear differently.  Let me explain

13  why I think it should be undisputed, also, your Honor, that

14  we've mooted this case.  The same plaintiff's lawyers filed

15  essentially the same complaint against another public company

16  several weeks earlier seeking precisely the same types of

17  disclosures.  That company made exactly the same disclosures

18  that -- obviously, the numbers are different, but exactly the

19  same format of disclosures that Netscout made last week, and

20  these plaintiffs admitted that those disclosures mooted that

21  case and filed a voluntary stipulation of discontinuance in

22  that case.  And so my belief, your Honor, is that the only

23  difference between this case and that case is that that issuer

24  agreed to pay some sort of a fee to the plaintiff and

25  plaintiff's counsel and my client has not.  So I think it is

1    really is indisputable that this issue has been mooted, and I

2    think it's going to be very difficult for the plaintiff to take

3    a contrary view.  Now, we may be briefing the issue of a

4    mootness fee, your Honor, and --

5        THE COURT:  That's something that I have to approve?

6    I've never run into the issue of a mootness fee before.

7        MR. ASCHER:  Sure.  So I can give some background on

8    that, your Honor.

9        There is quite a decent amount of case law, both in

10   the Delaware courts and to a lesser extent in the Southern

11   District about whether and to what extent a plaintiff's law

12   firm is entitled to be paid their attorneys' fees, in essence,

13   by a corporation when they bring a disclosure case.  And

14   typically that occurs, your Honor, in M&A cases in Delaware.

15   There's, frankly, a whole industry around this.  If two

16   corporations enter into a M&A transaction, there is almost

17   inevitably a series of disclosure cases filed by the

18   plaintiffs' securities bar saying that in your papers in the

19   various securities filing concerning a merger or spinoff or

20   whatever it is, you have disclosed this thing, you should have

21   disclosed that thing.  And, historically, public companies

22   would make those disclosures and agree to pay mootness fees.

23   Sometimes they'd be a few hundred thousand dollars.  Sometimes

24   they'd be $50,000, whatever.

25       In the last few years, the Delaware courts have

1    started clamping down on those mootness fees.  People have seen

2    these cases as, you know, a form of strike suit and, if you

3    will, a transaction tax whenever a public company tries to

4    enter into something, and so there have been a couple of major

5    cases coming out of Delaware in the last few years denying

6    these fees to plaintiffs when the disclosures that their cases

7    triggered were found to be immaterial and not to have provided

8    the key words are "a substantial benefit" to the company and

9    its shareholders.

10          There have also been a couple recent cases in the

11   Southern District on this, your Honor.  Judge Abrams and Judge

12   Oetken have both recently issued decisions saying, you know,

13   all well and good that you filed a case that caused a company

14   to make some more disclosures, but really these disclosures

15   were so insignificant, no fee should be payable.  So I think

16   that's the only issue that's left to be briefed, your Honor.  I

17   don't think it necessarily needs to be on the same timetable.

18   but that's where we are.

19          THE COURT:  Okay.  Understood.  I will turn to the

20   plaintiff, Mr. Gershon, or Mr. Toomey.  And I apologize that I

21   started with Mr. Ascher, but given that they had not put in

22   anything in response to your pleading, I hope you'll be okay

23   that I started with Mr. Ascher.

24          MR. GERSHON:  Perfectly okay with it.

25          My name is Arnold Gershon from Barrack Rodos & Bacine

1    representing the plaintiff Victoria Shaev.

2         Where to start?  Would your Honor prefer to start on

3    the subject of loss causation or is that not part of the case

4    at this time?

5         THE COURT:  Well, you tell me if it's part of the case

6    anymore.

7         MR. GERSHON:  I don't think it's part of the case, but

8    we do have loss causation in the sense that the plan if

9    approved would result in serious costs to the company, and,

10   furthermore, on the subject of the election of directors, we

11   submit that there is no need to show loss causation in such a

12   case because the statutory codification of this judge-made rule

13   says that you must show loss causation when there is a loss for

14   which you seek damages, and there are obviously no damages to

15   be sought based on the election of directors.  That's part of

16   the Private Securities Litigation Reform Act.

17        THE COURT:  Is there any case that espouses that view?

18        MR. GERSHON:  No, your Honor.

19        THE COURT:  Okay.  Appreciate your candor.

20        MR. GERSHON:  There are no cases that have actually

21   come up that have addressed that even though the statute --

22        THE COURT:  On the appellate level.  You will agree

23   that there are district court cases that have held that even if

24   a case seeking solely injunctive relief, the loss causation

25   pleading requirements still pertains.

1          MR. GERSHON:  Yes.  And we submit that we have shown

2    loss causation and that, in any event, to the extent that the

3    company is seeking approval of a stock incentive plan, but to

4    the extent that it's seeking election of directors, we submit

5    under the statute, I think it's 15 U.S.C. 78U-4(b), 2(b) or

6    3(b), something like that, is where that statutory language

7    appears.

8          THE COURT:  But you will agree with me that just at

9    least on say-on-pay vote, that as to that *Rubenstein* is all but

10   dispositive.  Do you have a way around *Rubenstein* given what it

11   says?

12         MR. GERSHON:  We submit that the same applies in this

13   instance, and that *Rubenstein* is, of course, a summary order

14   which is entitled to great respect, but it is not the last word

15   on the subject, and there is no case in the Second Circuit or

16   anywhere that we have been able to find that provides the last

17   word on that subject when considered in light of the statutory

18   codification of this rule that was initially laid down by Judge

19   Oakes 40 years ago or 50 years ago, whenever he did it.

20         THE COURT:  Let's put that to the side.  Let's

21   assume -- let's put that issue to the side for the most.

22   Mr. Ascher said, look, they've made these changes -- I'm not

23   holding you to this, but at the present time, do you have any

24   reason to disagree with Mr. Ascher that the case is moot, and

25   the only issue left is the issue of mootness fees?  If you're

 1    still thinking about it, that's fine, but I'm just trying to

 2    figure out kind of where we're at.

 3         MR. GERSHON:  We disagree, your Honor, and for this

 4    reason:  The case that he cites was a case that was settled.

 5    Instead of litigating it to the hilt, we decided to settle it.

 6    This case apparently we cannot settle.  And here's what's wrong

 7    with that supplemental proxy statement.  It states the

 8    assumptions only for the year fiscal 2024 but the regulations

 9    clearly requires that it's stated for all three years that are

10    shown in summary compensation table, which is '24, '23 and '22,

11    and these are regulations of the SEC.  And it might address the

12    case of *Loper Bright V. Raimondo* **where the court held that**

13    **where the Congress expressly delegates rule-making authority to**

14    **define terms to the agency, that must be given respect by the**

15    **court and in** *Loper* it cited *Batterton v. Francis*, which is an

16    earlier Supreme Court case, which held that the SEC's proxy

17    rules have the force and effect of law.  Accordingly, we

18    suggest that --

19         THE COURT:  Well, let me ask maybe a more basic

20    question.  Look, we are here on not even a motion.  We are here

21    on a proposed order to show cause for emergency relief.  I

22    guess my question is, is there still an emergency?  Because I

23    understand what you're saying about the earlier years.  As I

24    understand it, you're saying as to 2024, maybe they've

25    corrected that.  I'm sure Mr. Ascher can put in a supplement

1  that would address these prior years too.

2       My real question is, can I deny -- there's nothing for

3  me to deny.  There's no motion filed, but do we still have an

4  emergency here, or should we have a more relaxed and normal

5  briefing process on what remains of your case?  Help me out

6  with that.

7       MR. GERSHON:  The plaintiff will suffer irreparable

8  injury if they go forward with the vote, and then we have to

9  litigate whether the vote was fairly obtained.  The Second

10 Circuit in *Koppel v. 4987 Corp.*, which is cited in our brief,

11 said that they must prefer issues like this be resolved before

12 the vote is taken rather than to wait until after so that

13 plaintiff's lawyers don't have the chance to litigate forever

14 and build up big fees.  We have the exact same interest.  We

15 are trying to avoid protracted litigation.

16      THE COURT:  Connect the dots for me.  I get it.  So

17 what bearing do the 2022 and 2023 underlying assumptions have

18 on the pending vote that's going to occur in September?

19      MR. GERSHON:  They are required by the regulations of

20 the Securities and Exchange Commission in two cases, the Second

21 Circuit has held that where the SEC has express requirements

22 that certain information be disclosed, the failure to include

23 those disclosures is actionable.  That's *Seinfeld v. Gray* and

24 *Resnik v. Swartz* that are cited n our memorandum of law and

25 support.

1          THE COURT:  But just like, you know, speak to me like

2   I'm a five year old.  Like, what does it matter?  Like, why

3   does it matter, like these disclosures about the underlying

4   assumptions on the Monte Carlo simulation for 2022 and 2023,

5   how does that -- just if you're speaking to like someone on the

6   elevator, like why does it matter for the purposes of this

7   vote?  I'm not saying it doesn't like legally matter for the

8   reasons you're saying.  I'm just saying like if you're in the

9   elevator going down.  Go ahead.

10          MR. GERSHON:  I'm about to address that.  Judge Cote

11   held in the case of 2006 called *Unite Here v. Cintas*, the

12   uniform company.  Cintas is C-I-N-T-A-S.  Held that these

13   regulations requiring the disclosures concerning the

14   compensation of the executive officers are material because

15   they bear on the independence of the directors who are either

16   up for election or who have authorized this plan and therefore

17   they are material.

18          THE COURT:  If their compensation was through the

19   roof, that's a reason to question their independence and

20   whether they are good stewards of the company.

21          MR. GERSHON:  She held that they were material, and if

22   I may address the subject of the assumptions.  The assumptions

23   to be disclosed are the volatility and the interest rate and

24   what we know is that the greater those numbers are for the

25   volatility and the interest rate, the greater the cost of the

1    compensation.

2            Now, one thing I might point out, the next out

3    supplemental proxy statement shows that the grant date fair

4    value is less than the price of the underlying stock on the

5    date of grant.  That should not be.  It should normally be

6    higher, and we can offer up the statements of Radford, the

7    premier company that does Monte Carlo simulations to show that

8    very fact.  And the fact that they are less shows that

9    something is wrong.

10           Now, what could be wrong?  I expect my friend to say

11    that there is no upside potential to these restricted stock

12    performance stock unit awards, but that is not supported by the

13    proxy statement itself which makes an ambiguous statement.  On

14    one hand, it says the threshold and the maximum are the same,

15    but if you look at the grant date table, it shows no number is

16    entered for the maximum possible recovery.  And in that

17    situation, the presumption is that there is no maximum.  And so

18    therefore they have to fix this supplemental proxy statement

19    with an explanation of why the grant date fair value is less

20    than the price of the underlying stock on the date of grant.

21    And to the extent that they might say that it's part of the

22    structure of the award, in fact we don't know what the

23    structure of the award is because the 2024 form 10K shows as an

24    exhibit the underlying plan, the 2019 stock incentive plan, it

25    shows the form of a award of a regular time-based restricted

stock unit, but it does not include the award for a

performance-based restricted stock unit, and, therefore, we

submit that the supplemental proxy statement is incomplete,

inconsistent with the requirements of the regulations of the

SEC and inconsistent with the ability to give the information

that the stockholders need to determine what the value of these

awards -- what the cost of the company of these awards is, the

cost is expressed as grant date fair value.

THE COURT:  Okay.  You're not trying to hide anything

from Mr. Ascher, right?  All these things you think are

missing, like you want to help the company so you want them to

put in these supplements and just resolve this, right?

MR. GERSHON:  We suggest that they should put in a

supplement for the three years, and that they should explain in

greater detail what assumptions they made that caused the grant

date fair value to be less than the price of the stock on the

date of grant.

THE COURT:  That's it?  If they make those changes,

then victory is yours.

MR. GERSHON:  Yes, your Honor.

THE COURT:  All right.  Mr. Ascher, you got any more

questions about what they want in the proposed proxy

supplement?

MR. ASCHER:  I don't have more questions, your Honor.

I do have some answers if you have the patience for a little

1    bit more.

2            THE COURT:  Sure.  Hold on one second.  Mr. Gershon,

3    one question.  Based on your experience in this, would the moot

4    any fee you were paid if there is a dispute about that, that

5    that becomes an issue for the Court to decide, am I right about

6    that?

7            MR. GERSHON:  Oh, that.  In Delaware, the court wants

8    to take a look at it, and I don't know whether they want to

9    approve it, but they want to see it.  In the federal courts,

10   it's unclear.  Some years ago we had a case before Judge Sue

11   Robinson in the District of Delaware, and my learned friend in

12   that case was Judge Lewis Liman, now a judge in this court, and

13   we told Judge Robinson that we had a mootness fee, and if she

14   wanted to disclose it, we would tell her what it is.  She said,

15   "Don't bother me with the details.  Go on about your business."

16           On the other hand, Judge Weinstein said, "I want to

17   look at what that fee is.  And if it's okay, I'll approve it."

18   And we told him what the fee was in that case, and he signed

19   off on the order without any further elaboration.

20           So I think your Honor has discretion --

21           THE COURT:  In your view, is there any rule or

22   regulation or statute that requires judicial authorization of

23   these fees?

24           MR. GERSHON:  We are aware of no such rule, your

25   Honor.

```
 1              THE COURT:  Okay.  Let's just say for the moment that
 2    Mr. Ascher says, we've mooted this case because we've done
 3    everything that even arguably needs to be done to resolve this
 4    case.  However, we are not going to pay you any kind of
 5    mootness fee.  At that point, what remaining claim would you
 6    have to advance in this case?  Would it just be a pure
 7    attorneys' fees case?
 8              MR. GERSHON:  As Judge Weinstein said, you can then
 9    make a motion for a fee, but I hope you'll settle it and save
10    us all the trouble.
11              THE COURT:  I'm wondering what the motion is.  The
12    motion is just for attorneys' fees?
13              MR. GERSHON:  That would be yes, under rule whatever,
14    it is 56 something or other.
15              THE COURT:  All right.  Mr. Ascher, any responses?
16              ASCHER:  Yes.  Thank you, your Honor.  A few things.
17              First of all, I did want to respond to your elevator
18    speech question from the other perspective, of course, about
19    why these disclosures are not material, right?
20              So as Mr. Gershon explained, they are seeking the
21    assumptions used to calculate a fair value.  But there is no
22    dispute here Netscout always disclosed the fair value itself,
23    right?  That headline number was always disclosed to its
24    shareholders.  So all they're asking for is:  Give us the
25    numbers that you used to calculate the thing that you already
```

1    disclosed.  So all they're asking like is if somebody has a

2    computer at home that they could plug those numbers in and

3    check that our math is correct.  That's the level of disclosure

4    that they're asking for.  There is no question that we

5    accurately disclosed the number of shares that were paid to

6    these executives.  There is no suggestion at this point that it

7    was calculated inaccurately.  I'll get to one issue about that

8    later.  This is literally just:  Show me your math, on an issue

9    that itself is subsidiary.

10           THE COURT:  Just help me out with this.  Anybody, like

11   if I knew how to run Monte Carlo simulations, like I can do all

12   of this based on the inputs, right?

13           MR. ASCHER:  Yes.

14           THE COURT:  It's like a publicly traded company.  I

15   know the stock.  I can figure out like interest rate

16   assumptions.  I can make my own assumptions, run a simulation

17   and figure out what I think the fair value would be, right?

18   There's nothing like secret about it.  It's just that you had

19   to run the simulation to get to a fair value.  You ran the

20   simulation.  You said what the fair value is.  Everyone knows

21   you ran a Monte Carlo simulation, so they thought, well, maybe

22   these folks are up to no good.  They could just run it

23   themselves and then figure out that it's some different number.

24   Because you're not trying to say that you came up with the fair

25   value through some other means.  Like at the point that you say

1    like here is how we did it, and we made assumptions about these

2    various things, then that opens it up to anybody who might

3    disagree with that to just do it themselves if they wanted to.

4    Is there anything I'm missing in that?

5          MR. ASCHER:  No, your Honor.  That's probably a good

6    segue to the second point between the three-year disclosure

7    that they're still seeking and the one-year disclosure that

8    we've already made.  There are a few answers to that, your

9    Honor.  First of all, as I've already pointed out, they've

10   already agreed to moot the case on the same basis.

11         THE COURT:  What's the cost involved for doing it for

12   an extra two years, because you've already done it for 2024.  I

13   mean, maybe there's some different numbers in there, but like--

14         MR. ASCHER:  I don't know that there's a cost, but the

15   second point, your Honor, is we do read the statute

16   differently.  There are some things that are required to be

17   disclosed for three years and others for one year, and our read

18   of item 402(d) is that this is a one-year piece.

19         And then the final point to be made on that, your

20   Honor, all of this has to be material for us to be required to

21   disclose it, right?  And so the 2024 figure that we've already

22   disclosed, that allows somebody to verify our calculation.

23   What point is there in giving someone information to go back

24   and verify calculations for 2022 and 2023?  That compensation

25   has already been paid.  The company has already given it to

 1   those executives.  It's over and done with.  So we've given the

 2   stockholders the information that they need for 2024.  We do

 3   maintain, your Honor, that that is exactly what the statute

 4   requires, and certainly anything more would be immaterial.

 5            The two other points I wanted to make, your Honor,

 6   Mr. Gershon expressed some confusion as to why the fair value

 7   that the company has reported is not higher.  We have explained

 8   that to him.  I thought he understood it before I talked into

 9   the room today.  I think they are misreading.  I think they are

10   just misreading the materials.

11            The reason it's not higher is Netscout's compensation

12   plan is a little bit different than some other companies.  Some

13   companies have it sort of a two-way ratchet, meaning if the

14   company's performance is above certain thresholds, the amount

15   of stock goes up.  If it's below certain thresholds, it goes

16   down.  That's how it often work.  Therefore, the value can be

17   either more or less than the current stock price.

18            Netscout's a one-way ratchet down, meaning they're

19   presumptively going to get a certain amount of stock, but if

20   they don't hit certain benchmarks, it goes down.  Because of

21   that, the valuation is lower than a two-way ratchet where

22   you've got a chance of going up or down.  So I thought we were

23   all clear on that.

24            THE COURT:  Am I right that you basically gave sort of

25   the max value, and so the only thing that could happen is it

1   can be less?

2           MR. ASCHER:  Yes.

3           THE COURT:  And it can't be more.

4           MR. ASCHER:  Yes.  And that is all disclosed, your

5   Honor.  It's not the easiest thing to understand, but it's all

6   disclosed.

7           Finally, your Honor, on the whole fee request issue,

8   Mr. Gershon did cite a couple of cases where federal judges,

9   including Judge Weinstein, have said, "Pay the fee and leave me

10  alone."  I understand that.  Those cases are kind of ancient

11  history in the world of mootness fees.  The Delaware courts in

12  the first instance, and now the Southern District, have really

13  taken a different look at them.  The Judge Abrams case and

14  Judge Oetken case that I mentioned are both much more recent

15  cases.  There has been a recognition, as I said before this is

16  a transition tax on public companies, and it's a tax that

17  shouldn't be paid unless the disclosures are truly material and

18  provide a substantial benefit to the shareholders.

19          THE COURT:  I'm just trying to fit that into not

20  issuing advisory opinions because the folks upstairs told me

21  that I'm not supposed to do that.  So like what rule or

22  regulation does this fall under?  Let's assume Netscout says,

23  "No dice.  We're not playing this game.  We're not paying you

24  any mootness fees."  And then Mr. Gershon comes in here and he

25  asks me for something, what does that come under?

 1          MR. ASCHER:  I think that's the -- that is a good

 2   question, your Honor.  In Delaware M&A cases, the Delaware

 3   courts have said that when the plaintiff causes, brings about a

 4   substantial benefit to other shareholders, the plaintiffs'

 5   lawyers are entitled to a fee.  I think there is a substantial

 6   question as to whether that doctrine, which I see as a creature

 7   of Delaware law is applicable --

 8          THE COURT:  It's litigated in a Delaware court.

 9   That's what I understood too.

10          MR. ASCHER:  Yes.  And I want to caution, your Honor.

11   I haven't fully researched this issue.

12          THE COURT:  Okay.

13          MR. ASCHER:  But there is a question in my mind as to

14   whether that doctrine would apply in a federal securities case.

15          THE COURT:  Okay.  Understood.

16          Well, this has been very helpful.  We have a briefing

17   schedule, but based on what I have heard today, my

18   understanding is that within the next nine days the parties are

19   going to be working hard to see if they can resolve this case

20   so that we don't have to continue with any further briefing

21   given the substantial progress that both sides have made

22   already and hopefully we've advanced the ball through the

23   discussion today.  If not, I suppose we will have a response to

24   the proposed order to show cause on August 28.  So we will put

25   that in an order.

1          Mr. Gershon, I think I have raised with you some of

2    the questions I had about loss causation, whether that applies

3    here.  I have to say I do have a substantial question, and

4    Mr. Ascher has picked this up on the materiality requirement in

5    this context given the facts and circumstances involved, and

6    the overhang, of course, is we have this issue of mootness

7    given the supplemental proxy statement.  So it may be that you

8    will have discussions with Mr. Ascher and will decide that this

9    is not -- you have many causes potentially involving serious

10   materially misleading disclosures or omitted information, but

11   maybe this isn't it.  Maybe you'll tell me no, Judge, that's

12   not the case.  There is a materially misleading disclosure in

13   this case, which I'm happy to hear your briefing.  In any

14   event, do your best over the next week or so to see if this can

15   be resolved in a way that would not require this kind of

16   expedited briefing which the Court never likes to be in a

17   situation, unless it's necessary, to put people on short

18   timetables, especially when there are important and novel and

19   complicated legal issues to be of resolved.  You understand

20   that, right?

21          MR. GERSHON:  Very well.  Yes, I do, your Honor.

22          THE COURT:  Anything further from either side?

23   Mr. Gershon, anything further from you?

24          MR. GERSHON:  Oh, we would be briefing this if we had

25   to, but I just wanted to draw one distinction between the

1  merger cases and the instant cases.  The merger cases do not

2  involve disclosures that are specifically required by any

3  agency or any government:  Not the state of Delaware, not the

4  United States Securities and Exchange Commission, nobody

5  specifically requires these.  And in the two cases cited in our

6  brief mentioned *Reznik v. Schwartz* and *Seinfeld v. Gray*, the

7  courts held that a disclosure is required either in one of two

8  circumstances to be material:  One is if it's required to make

9  other disclosures not misleading or, two, if it is specifically

10  required that a regulations and rules of the Securities and

11  Exchange Commission, and we submit that this falls directly,

12  exactly, precisely within those two cases.

13        THE COURT:  Okay.  So after you roll up your sleeve

14  and over the next week try to resolve this, then you are going

15  to see Mr. Ascher's response to all of that, and then you will

16  have a chance to reply.

17        MR. GERSHON:  Yes.

18        THE COURT:  Good.

19        Mr. Ascher, anything further on your end?

20        MR. ASCHER:  No, your Honor.  I don't know whether the

21  PSLRA applies to this case.  We will be looking at the attorney

22  fee shifting of that provision to see if it applies, but we

23  will submit our papers if we can't resolve it.

24        THE COURT:  Okay.  I think he was talking to you,

25  Mr. Gershon, in that last comment, but, you know, that's fine.

1          Mr. Ascher, could you do me a favor?  Could you send

2    an email to chambers, copying plaintiff's counsel, of course,

3    and just give me the citations of those two cases, the Oetken

4    and Abrams case that you had mentioned that sort of address

5    this issue?  I'm curious and would like to take a look.

6          MR. ASCHER:  Absolutely, your Honor.

7          THE COURT:  All right.  Anything further from either

8    side?

9          MR. GERSHON:  No, your Honor.

10          THE COURT:  Good look over the next week.  I know you

11    will have many fruitful discussions with each other in an

12    earnest attempt to resolve this.  If not, we will continue with

13    the briefing.  I think the one homework assignment on our end

14    is to put in an order with the correct dates, so thank you for

15    advising me about the typo in the letter, which we then

16    replicated in our order.

17          Thank you very much.  We are adjourned.

18          (Adjourned)

19

20

21

22

23

24

25